IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| M. CHARLENE FABRIZIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 10-1175 |
| | ) | |
| UPMC and BIOTRIONICS, INC., | ) | Judge Conti |
| | ) | Magistrate Judge Mitchell |
| Defendants. | ) | |

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment filed on behalf of

the Defendants (ECF No. 29) be denied.

II.     Report

Plaintiff, M. Charlene Fabrizio, brings this employment discrimination action pursuant to

the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA), and the Pennsylvania

Human Relations Act, 43 P.S. §§ 951-63 (PHRA), against the Defendants, UPMC and

Biotronics, Inc.[1]  She alleges that Defendants discriminated against her on the basis of her age

(60) in three respects: when they eliminated her position as Director of Perfusion Services for

Presbyterian University Hospital on August 31, 2007; when they failed to consider her for an

open management position following the elimination of her position; and when they failed to hire

her for a staff perfusionist position in October and November 2007.

Currently pending for resolution is a motion for summary judgment, brought on behalf of

the Defendants.  For the reasons that follow, the motion should be denied.

---

[1] In the record, this entity is always identified as "Biotronics."  The spelling "Biotrionics" in the
caption appears to be a mistake.

<u>Facts</u>

Plaintiff was born on November 16, 1946. She was hired as a staff perfusionist at Children's Hospital of Pittsburgh in April 1982. (Fabrizio Dep. at 6-7 & Ex. 15.)[2] At the time, Children's Hospital of Pittsburgh was not a part of the UPMC system. (<u>Id.</u> at 6.) In September 1990, the Perfusion Services Department at Children's moved to Presbyterian University Hospital, which was a part of UPMC. (<u>Id.</u> at 7.) On September 9, 1990, Plaintiff became the Director of Perfusion Services at Presbyterian. (<u>Id.</u> at 7-8.)

As Director of Perfusion Services at Presbyterian, Plaintiff assisted in the development of the Perfusion Services Department and performed multiple administrative and clerical tasks in the Department including maintaining equipment, supervising and developing staff perfusionists, and enforcing organizational, departmental and outside regulatory requirements. (<u>Id.</u> at 12-13 & Ex. 1.)

Plaintiff states that she also had additional duties and responsibilities in her position as Director of Perfusion Services, including laboratory management, development of all perfusion-related policies and procedure and development and maintenance of and instruction in unique programs such as ECMO (Extracorporeal Membrane Oxygenation), Perioperative Blood Management, and Continuing Education programs for Allegheny County and regional perfusionists. She also managed research, authored for various publications and made frequent presentations. (Fabrizio Aff. ¶¶ 3-4.)[3]

On July 1, 2001, Plaintiff became an employee of Biotronics, Inc. (Fabrizio Dep. at 11.) This was the result of a merger between Presbyterian University Hospital and Shadyside Hospital into one unit under the umbrella of UPMC. (<u>Id.</u> at 12.) Biotronics is a wholly-owned

---

[2] Defs.' App. (ECF No. 31) Tab A.
[3] Pl.'s App. (ECF No. 43) Ex. 23.

subsidiary of UPMC.  (Id. at 11.)  It has two separate parts: a "for profit" part and a "UPMC" part.  (McEwen Dep. at 15.)[4]  The "UPMC" part provides perfusion services for UPMC hospitals at cost.  (McEwen Dep. at 15.)

Stephen Stewart was hired at Shadyside Hospital in October 1977 as a staff perfusionist and was promoted to Assistant Director of Perfusion Services at Shadyside Hospital twenty years later.  (Stewart Dep. at 24-25.)[5]  Stewart's date of birth is February 28, 1954.  (Stewart Dep. at 6.)  Plaintiff first met Stewart in the spring of 1976 when she was a staff perfusionist at Shadyside Hospital and he was a student.  (Fabrizio Dep. at 13.)  In fact, she was one of Stewart's instructors for several months at that time.  (Fabrizio Dep. at 14.)  Plaintiff indicated that, in the mid-1990s, she was located at Presbyterian University Hospital while Stewart worked at Shadyside Hospital.  (Fabrizio Dep. at 15.)

In the early 2000s, Stewart became the Director of Perfusion Services at Shadyside Hospital.  (Fabrizio Dep. at 16; McEwen Dep. at 18.)  At that point, Plaintiff and Stewart held equivalent positions.  (Fabrizio Dep. at 16.)

Stewart Becomes Plaintiff's Supervisor

In September 2006, Stewart was promoted to the position of Senior Director of Perfusion Services for the entire UPMC System.  (Fabrizio Dep. at 17-18; McEwen Dep. at 70, 80; ECF No. 42 Ex. 19.)[6]  He was promoted by Jack McEwen, the Executive Director of Perfusion

---

[4] ECF No. 31 Tab B.
[5] ECF No. 40 Ex. 7.
[6] Stewart denies that the position was called "Senior" and states that it was merely Director of Perfusion Services. (Stewart Dep. at 27.)  However, on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009) (citation omitted).  Not only does the record contain an email referring to Stewart's position as "Senior," but McEwen testified that this was his title.  In addition, Defendants' Answer to Plaintiff's Interrogatory No. 1 indicates that Stewart was the Senior Director of Perfusion

Services for Biotronics.  (Fabrizio Dep. at 17, 19.)  McEwen made this decision because he wanted one person to oversee the management of all Biotronics perfusion services employees at Presbyterian University Hospital, Shadyside Hospital, and Passavant Hospital.  (Fabrizio Dep. at 19.)  Plaintiff supported this change. (Fabrizio Dep. at 20.)

McEwen asked Stewart, Plaintiff, and Lisa Knauf (the Lead Perfusionist at Passavant Hospital) to apply for the new position. (Fabrizio Dep. at 20; McEwen Dep. at 34-35.)  Defendants note that Stewart was the only person who applied for the position.  Plaintiff did not apply.  (Fabrizio Dep. at 21; McEwen Dep. at 21.)

Plaintiff responds that the position had a qualification which preferred an MBA. (Fabrizio Dep. at 20.)  At the time, she felt that McEwen wanted Stewart for the position because there are very few perfusionists who have MBAs.  (Fabrizio Dep. at 20-21.)  Plaintiff interpreted McEwen's request for an MBA, which she does not have but Stewart does, as a required qualification for the job.  (Fabrizio Dep. 21-22; Stewart Dep. at 24.)  Knauf, who does not have an MBA, also did not apply.  (Fabrizio Dep. at 21.)

When Stewart became the Senior Director of Perfusion Services for the whole UPMC system, Presbyterian University Hospital (for which Plaintiff was responsible) fell under his supervision and Stewart became Plaintiff's direct supervisor. (Fabrizio Dep. at 17-18; Stewart Dep. at 46.)  McEwen was Plaintiff's second-level supervisor.  (Fabrizio Dep. at 17; McEwen Dep. at 9, 36-37.)  McEwen's date of birth is July 10, 1946.  (McEwen Dep. at 6.)

Stewart's job as Senior Director of Perfusion Services for the entire UPMC system was, in part, to standardize the perfusion service practices at Presbyterian, Shadyside, and Passavant Hospitals.  (Stewart Dep. at 33.)  Stewart testified that "part of my instructions from my superior

---

Services (ECF No. 42 Ex. 17).

was to integrate the staffs between Presbyterian and Shadyside. My interpretation of that was to also … standardize the practice of how the labs were run." (Stewart Dep. at 33.)

Paula Merritt was the Lead Perfusionist at Shadyside Hospital and started in that position in 2006. (Merritt Dep. at 9.)[7] Merritt's date of birth is September 20, 1960. (Merritt Dep. at 7.) Lisa Knauf was the Lead Perfusionist at Passavant Hospital beginning in 2002. Her date of birth is September 19, 1972. (Knauf Dep. at 6, 9.)[8]

At Presbyterian University Hospital, where Plaintiff was the Director of Perfusion Services, there was no person in the position of Lead Perfusionist. Rather, Jane Hackett, a staff perfusionist, held the title of "team leader." (Hackett Dep. at 56-58;[9] ECF No. 41 Ex. 11; Bose Dep. at 59-60;[10] ECF No. 42 Ex. 17, Answer to Interrog. No. 3; Fabrizio Dep. at 25-26; Knauf Dep. at 16-17, 22.) Hackett worked part-time until September of 2007. (Hackett Dep. at 10, 15.)[11]

Hackett, Knauf and Merritt all had similar job duties. (Fabrizio Dep. at 28; Stewart Dep. at 155; Merritt Dep. at 50; Hackett Dep. at 64.) As Plaintiff described it, these job duties were something above those of a staff perfusionist, but something below those of a Director of Perfusion Services. (Fabrizio Dep. at 28.)

---

[7] ECF No. 31 Tab E.
[8] ECF No. 31 Tab F.
[9] ECF No. 31 Tab D.
[10] ECF No. 37 Ex. 1.
[11] Defendants cite evidence from which the trier of fact might conclude that Hackett became the Lead Perfusionist at Presbyterian in 2001. (Hackett Dep. at 11-12; Stewart Dep. at 87; McEwen Dep. at 42, 44; Donina Decl. ¶¶ 4-5 & Ex. A (ECF No. 47 Tab B).) However, as noted above, at this stage of the proceedings, the facts must be viewed in the light most favorable to Plaintiff as the non-moving party and all reasonable inferences must be drawn in her favor. In addition, it is noted that Defendants have selectively cited a portion of Hackett's deposition in which she claimed to have been the Lead Perfusionist since 2001, but have omitted the later portion of her testimony in which she admitted that, pursuant to an evaluation from March 2006, she was the "team leader" at that time. Counsel must know that such tactics are inappropriate.

Knauf and Merritt reported directly to Stewart when he was the Senior Director of Perfusion Services for the entire UPMC system. (Knauf Dep. at 11; Merritt Dep. at 12-13; Fabrizio Dep. at 28; Stewart Dep. at 155-56.)

Hackett reported to Plaintiff at Presbyterian University Hospital and not to Stewart. (Fabrizio Dep. at 26.) This is because, at the time Stewart became the Senior Director of Perfusion Services for the entire UPMC system, Presbyterian was the only hospital at UPMC that had its own Director of Perfusion Services. (Fabrizio Dep. at 24.)

<u>Plaintiff's Problems with Stewart's Supervisory Authority</u>

Stewart described his relationship with Plaintiff as "strained," almost as if Plaintiff never accepted the fact that Stewart was her supervisor. (Stewart Dep. at 31.) Plaintiff testified that she had "differences of opinion" with Stewart when she became his subordinate, but that she thought this was "healthy." (Fabrizio Dep. at 29.) Plaintiff testified she was not upset that Stewart was promoted to be her supervisor. (Fabrizio Dep. at 22-23.) In fact, she testified that she told Stewart, upon learning that he was promoted to Senior Director, that she felt they would have "a good working relationship" as they had already "worked together on several things." (Fabrizio Dep. at 23.)

Stewart, as part of his job to standardize practices across all UPMC hospitals that had perfusion services departments, wanted all locations to manage the laboratory in the Operating Room as it had been managed at Shadyside Hospital. (Fabrizio Dep. at 29.) Defendants state that Plaintiff did not accept Stewart's direction in this regard, admitting that she and Stewart had a "conflict of opinion" as to whether Stewart had the authority to implement such a change in the management of the lab at Presbyterian University Hospital. (Fabrizio Dep. at 32.) Stewart states that Plaintiff often did not accept his directives intended to standardize the Perfusion Services

Departments and refused to follow through on implementing some of those standardizations. (Stewart Dep. at 37.)

Plaintiff disputes this statement and responds that Dr. Mohamed Virji, who was in charge of the lab at Presbyterian University Hospital, mandated that UPMC Presbyterian Perfusion department perform its own testing, proficiency, quality controls and quality assurance programs. (Fabrizio Dep. at 29-30; Fabrizio Aff. ¶ 8.)  Moreover, the federal and state regulatory agencies required the perfusion departments to perform their own lab work.  (Fabrizio Aff. ¶ 6.)

Defendants state that Plaintiff, without Stewart's authority or permission, wrote to a professional publication called Perfuist regarding "new ideas" about a classification of equipment called ECMO machines. (Fabrizio Dep. at 35-36.)  Plaintiff acknowledged that it was Stewart's prerogative to require his authority before writing to a professional publication, but indicated that she did not realize in advance of submitting the question that he would be upset that she had not sought his permission to do so.  (Fabrizio Dep. at 35-36.)

Ordering Equipment

Defendants state that Plaintiff attempted to order capital equipment – heart-lung machines – that Stewart expressly instructed her not to order.  (Stewart Dep. at 41-42.) According to Stewart, Plaintiff wanted to order two new heart-lung machines for Presbyterian University Hospital.  Stewart, however, wanted to wait to order the equipment until the needs of the other hospitals were determined so that all of the heart-lung machines could be ordered together at a discount.  (Stewart Dep. at 42.)  Plaintiff ordered the machines anyway.  As a result, according to Stewart, Plaintiff met with him and Paulette Bingham, who informed Plaintiff that she was "out of line" in ordering the equipment. (Stewart 42-43.)  Stewart did not recall whether he disciplined her for this alleged misconduct. (Stewart Dep. at 43.)

7

Stewart also testified that Plaintiff did not participate as he expected when he attempted to bring in new equipment for the surgeons at Presbyterian University Hospital. (Stewart Dep. 44.) Plaintiff explained that the Presbyterian surgeons did not want the new equipment. (Stewart Dep. at 44.) Again, Stewart could not recall whether he disciplined her for the alleged problem. (Stewart Dep. at 45.)

Plaintiff disputes these statements and testified that in order to have capital budget items, they needed to be submitted early in the calendar year so that the administration could review them in time. (Fabrizio Dep. at 37.) She further testified that Stewart asked her to order certain kinds of cardioplegia machines, a couple of heart lung machines and some extra heater coolers. (Fabrizio Dep. at 37.) Plaintiff testified that Stewart told her what to buy but that she herself did not have the authority to do so. (Fabrizio Dep. at 37.) She and Stewart went to Paulette Bingham, Surgical Services Director, because Bingham also had to approve the order and understand its necessity. (Fabrizio Dep. at 37-38.) Plaintiff testified that as far as she as aware, there was no disagreement regarding the heart lung machines. Plaintiff denied ever being informed that Stewart allegedly wanted to order heart lung machines for all three hospitals simultaneously to save on costs. (Fabrizio Dep. at 38.)[12]

Stewart stated that he never had any formal counseling sessions, warning sessions or disciplinary sessions with Plaintiff about her performance, but that he would informally tell her verbally about her "management style" and her "accountabilities." (Stewart Dep. at 128-29.)

The email to Bingham

Defendants state that, on August 21, 2007, Plaintiff wrote an e-mail to Bingham in which she complained to Bingham about Stewart's "screw-ups," "errors" and "self-righteousness."

---

[12] Neither party has submitted evidence from Bingham, the third person in the room, as to what occurred regarding the heart-lung machines.

(Fabrizio Dep. Ex. 4.) Plaintiff intimated that Stewart was ignorant of the scope of the Perfusion Services Department at Presbyterian University Hospital or how to work in or manage that Department. Plaintiff ended the e-mail by stating that she "cannot think of one positive thing for our Presby perfusion program since [Stewart] became Senior Perfusion Director." (Id.)

Plaintiff states that, during her last year of her employment, she felt that she was being treated unfairly by Stewart, that she spoke of her concerns with Bingham, who was the Surgical Services Director, and that Bingham asked her to submit, in writing, what she considered to be her positive attributes and an explanation of her concerns with Stewart's treatment of her. (Fabrizio Dep. at 80; Fabrizio Aff. ¶¶ 9-11.) Prior to writing the email, Plaintiff talked with Bingham about various issues and concerns. After their discussion, Bingham asked Plaintiff to put those concerns in writing. (Fabrizio Aff. ¶ 11.)

Plaintiff also notes that she also informed Bingham in her email that she believed Stewart was using her age against her, as she stated, "[t]he impli[cation] I should leave because of 'age' was another issue." (Fabrizio Dep. Ex. 4.) Plaintiff admitted that this e-mail was not an example of professional behavior on her part, although she testified that she did not consider it to be "inappropriate." (Fabrizio Dep. at 85, 96.) She also did not think that her email "crossed any line" because the relationship she had with Bingham permitted her to discuss such concerns freely. Plaintiff would not, however, send such an email to anyone but Bingham. (Fabrizio Dep. at 86.)

Defendants assert that Plaintiff simply did not like Stewart's management style and complained about it to subordinates such as Jane Hackett and to other employees who held lesser positions, such as Paula Merritt. (Fabrizio Dep. at 38-40.) However, Plaintiff notes that she actually testified that she did not have a problem with Stewart's management style (Fabrizio

Dep. at 89) and that she complained to Hackett and Merritt about Stewart, but not his management style.  (Fabrizio Dep. at 38-40.)  Moreover, Hackett told Plaintiff that she believed Stewart did not treat Plaintiff fairly.  (Fabrizio Dep. at 39; Hackett Dep. at 22-23.)

Whether Plaintiff Was Qualified to Perform Lab Work

Stewart testified that Plaintiff took a stance that conflicted with his regarding who could actually perform quality assurance testing and the process by which that was accomplished but could not provide any further detail.  (Stewart Dep. at 33.)  Stewart also admitted that he did not discuss this concern with Plaintiff and did not actually know whether she had the requisite training to perform the testing, although he stated that he knew Plaintiff "did not have the required MT (ASCP)."  (Stewart Dep. at 39.)

When he asked, Plaintiff told him that she did not believe that the procedure occurring at the Shadyside lab was appropriate.  Stewart, however, could not recall any details that Plaintiff relayed to him about the matter.  (Stewart Dep. at 33.)  Plaintiff told Stewart that she should be the sole person to handle the lab work at Presbyterian University Hospital.  (Stewart Dep. at 38.) Defendants note that it was not proper for Plaintiff to tell Stewart, who was her direct superior and supervisor (Fabrizio Dep. at 17-18), what to do.  Stewart told her that he did not think that she was qualified due to a lack of training the work required.  Stewart admitted, however, that he never asked Plaintiff if she had the training. (Stewart Dep. at 38-39.)  Stewart stated that Plaintiff required an MT (ASCP) in order to handle the quality analysis for lab data and that he knew that Plaintiff did not have an MT (ASCP).  (Stewart Dep. at 38-39.)

Staff Utilization

Regarding the staffing, Stewart testified that Plaintiff challenged him about how the staffs were utilized between Presbyterian University Hospital, Shadyside Hospital and the VA

Hospital. (Stewart Dep. at 39-40.)  According to Stewart, Plaintiff gave resistance about integrating the staff, the timing of the integration and the general logistics of the integration. (Stewart Dep. at 40.)  Specifically, Stewart testified that the "resistance" consisted of Plaintiff's telling him that "they were too busy" or that "somebody was off that day" so a particular directive could not be accomplished, and Plaintiff always had a "reason why it couldn't be done."  (Stewart Dep. at 40.)

Stewart did not always believe Plaintiff when she told him the statements above but could not recall whether he ever told Plaintiff that he did not believe her reasons. (Stewart Dep. at 40-41.)  Stewart testified that regardless of the difficulties, he expected Plaintiff to "be able to appropriately manage her people to make people available," irrespective of who was off or too busy in any particular circumstance. (Stewart Dep. at 40.)

<u>Plaintiff's Position is Eliminated on August 31, 2007</u>

In August 2007, Stewart made the decision to eliminate Plaintiff's position and Senior Human Resources Consultant Leslie Bose assisted the process from an HR perspective. (Fabrizio Dep. at 44; Bose Dep. at 11, 20; ECF No. 31 Ex. 17.)  Bose testified that Stewart made the decision to terminate Plaintiff's position and that she (Bose) merely agreed with it. (Bose Dep. at 20-21.)

Stewart told Bose that there was no need to have two directors (Stewart and Plaintiff), one reporting to the other.  (Bose Dep. at 21.)  Bose understood that the reason for Plaintiff's termination was "it was more of the position that didn't need to exist."  (Bose Dep. 26.) Stewart did not tell Bose about any alleged performance problems that he thought Plaintiff had when they were discussing the decision to terminate her. (Bose Dep. at 40.)

On August 31, 2007, Plaintiff was summoned to a meeting in Stewart's office.  (Fabrizio

Dep. at 47.)  Stewart, Bose, and Kathryn Shirk, another UPMC HR employee, were present in addition to Plaintiff.  (Fabrizio Dep. at 47, 59.)  Plaintiff was informed that her position was being eliminated because of a "reorganization."  (Fabrizio Dep. at 6, 47.)  She was not told whether or not she could not apply for another UPMC position.  No one at the meeting told her that there was an open position, but she heard from others that she would be able to apply for other UPMC positions. (Fabrizio Dep. at 72.)  Stewart admitted that no other positions were eliminated in the "reorganization." (Stewart Dep. at 92.)

At his deposition, Stewart stated that there were two reasons for elimination of Plaintiff's position: 1) acts of insubordination by her; and 2) the fact that the title of her position – which was the only Director of Perfusion Services position at any of the UPMC hospitals – was redundant of his own.  (Stewart Dep. at 20, 50-51.)  However, he did not say anything about acts of insubordination at the meeting on August 31, 2007.  Stewart admitted that Plaintiff could competently perform the clinical duties of a perfusionist during her employment. (Stewart Dep. at 29-30.)  Plaintiff was not terminated for performance reasons.  (Bose Dep. at 40.)

<u>Hackett Takes Over Plaintiff's Responsibilities</u>

At the time of her termination, Plaintiff was 60 years old.  (Fabrizio Dep. at 160.)[13]  Jane Hackett, a staff perfusionist and "team leader" at Presbyterian University Hospital, took over most of Plaintiff's job duties.  (Fabrizio Dep. at 63; Stewart Dep. at 86; Bose Dep. at 30; ECF No. 42 Ex 17.)  Hackett, whose date of birth is December 13, 1953, testified that she took over all of Plaintiff's duties.  (Hackett Dep. at 6, 48.)

---

[13] Defendants state that, at the time the decision was made, Stewart did not know what Plaintiff's age was.  (Stewart Dep. at 142.)  However, Plaintiff testified that she first met Stewart in the spring of 1976 when she was a staff perfusionist at Shadyside Hospital and he was a student.  (Fabrizio Dep. at 13.)  Plaintiff was one of Stewart's instructors for several months at that time.  (Fabrizio Dep. 14.)  Therefore, it is a fair inference from the record that Stewart had a general idea of her age, given they knew each other for 31 years.  <u>See</u> discussion <u>infra</u>.

Stewart testified that he did not reduce Plaintiff to Lead Perfusionist instead of discharging her because "that position was not available." (Stewart Dep. at 105.) When asked why he did not simply terminate Hackett, assign Plaintiff the Lead Perfusionist position and rehire Hackett when the subsequent staff perfusionist position was created, Stewart said that he did not think that "it was appropriate to put such a demotion on Jane Hackett." (Stewart Dep. at 106.) He saw "no reason, no justification" to demote her.

Stewart admitted that he did not know what job responsibilities Hackett actually performed prior to Plaintiff's termination or whether they were the same as the Lead Perfusionists at Shadyside Hospital or Passavant Hospital. (Stewart Dep. at 157-58.) At Plaintiff's termination, her job duties were assumed by Hackett who became the Lead Perfusionist at Presbyterian University Hospital. (ECF No. 42 Ex. 17, Answer No. 2; Stewart Dep. at 86, 87; Hackett Dep. at 11, 18.)

Prior to Plaintiff's termination, she was Hackett's immediate supervisor. (Fabrizio Dep. at 25-26.) Stewart made the decision to assign Plaintiff's responsibilities to Hackett. (Bose Dep. at 31; Stewart Dep. at 92.) Hackett was 53 years old. (Hackett Dep. at 6.) At the time Stewart terminated Plaintiff, he had already decided that Hackett would assume her responsibilities. (Stewart Dep. at 95.) Bose does not know why Plaintiff was not merely reduced in title to Lead Perfusionist in order to continue doing her job. (Bose Dep. at 31-32.)

Bose observed that the Personnel Action Request Form called Hackett a "Flex Full Time" employee, but listed her as .7 FTE, indicating that she was not working a full time schedule. (Bose Dep. at 61.) The document also indicated a transition from 28 to 40 hours per week. Defendants contend that, in the end, the only thing Bose could say about it is that she was "not sure" and that the "28 to 40" language "makes me believe" that Hackett was going to full time.

(Bose Dep. at 61-62.)  However, Hackett herself testified that she became a full-time employee in September 2007.  (Hackett Dep. at 10, 15.)

According to Stewart, after Plaintiff's termination, he spoke with Jim Terwilliger, Vice President of Operations, Presbyterian University Hospital, about the matter and told Terwilliger that she was terminated because her position was considered to be redundant.  (Stewart Dep. at 78.)  Terwilliger stated that he was told there was a reorganization.  (Terwilliger Dep. at 16.)[14] Stewart stated that Terwilliger was displeased that Plaintiff was terminated rather than being demoted to a different position, as he had suggested.  (Stewart Dep. at 78.)

Also after Plaintiff's termination, Stewart spoke with two surgeons, Dr. Larry Wei and Dr. Ken McCurry, about the reasons why he terminated her. (Stewart Dep. at 79.)  Stewart told them the reason was that her "position was redundant" and was being eliminated.  There is no record evidence that when Stewart spoke with Dr. Wei and Dr. McCurry about her termination he mentioned anything about her alleged insubordination as a reason.

<u>There Were Other Directors of Perfusion Besides Plaintiff</u>

Plaintiff states that Defendants had three other Directors of Perfusion: Paul Thomas, Daniel Barber and Kristen Costales, who were not terminated with her.  (Bose Dep. at 50-53; ECF No. 42 Ex. 18.)  Defendants respond that Biotronics has two "arms" – a "for-profit" arm and a UPMC arm.  (McEwen Dep. at 15.)  The UPMC arm provides perfusion services to UPMC hospitals at cost.  The for-profit arm provides perfusion services to outside hospitals. (<u>Id.</u>) Stewart directed the perfusion services departments for the UPMC arm, not the for-profit arm. (McEwen Dep. at 19; Fabrizio Dep. at 17-19.)  The three employees to whom Plaintiff refers— Paul Thomas, Daniel Barber and Kristen Costales—all worked for the for-profit arm and not for

---

[14] ECF No. 31 Tab H.

UPMC Hospitals. Specifically, Thomas worked at Western Reserve Perfusion, Barber worked at Trumbull Perfusion, and Costales worked for some entity in Hawaii. (Bose Dep. at 51-53.) In fact, Bose did not even know who Thomas and Barber were. (Bose Dep. at 51-52.) Stewart noted that Thomas was in a completely different business unit from him and outside his chain of supervision and that he had no idea who Costales was. (Stewart Dep. at 151-52.) As such, Defendants argue that these three employees are completely irrelevant to the analysis.

<u>Whether Another Management Position was Open at the Time</u>

Defendants assert that, when Stewart and Bose originally discussed the position elimination with Jack McEwen, they intended only to demote Plaintiff to a lesser position, but that they were unable to do so because there was no position open into which Plaintiff could be demoted. (Stewart Dep. at 52-53, 68, 107.)

Defendants contend that Plaintiff alleges that Stewart and McEwen told Bingham, Terwilliger and President of UPMC Presbyterian Shadyside John Innocenti about an open management position, but she was not present during any such conversations and believes that it is possible that Bingham or Innocenti and Terwilliger could have misunderstood Stewart. (Fabrizio Dep. at 61-62.) Neither Terwilliger nor Innocenti recalls any conversation in which they discussed employment opportunities that would be available to Plaintiff post-elimination. (Terwilliger Dep. at 18-19; Innocenti Dep. at 21-22, 26-27.[15]) They also contend that Plaintiff alleges that Hackett and unnamed staff members were told about an open management position by Stewart, but Plaintiff was not present for and did not witness any such conversations. (Fabrizio Dep. at 73.) Plaintiff has no knowledge as to the name of any open and vacant management position. (Fabrizio Dep. at 73-74.) Plaintiff believes that the position existed and

---

[15] ECF No. 31 Tab I.

that it was "taken off the table" by Stewart, but has no evidence of that except for second-hand conversations.

Defendants assert that Plaintiff was never informed by any person in authority that there was an open management position. (Fabrizio Dep. at 73.) Specifically, Plaintiff was never so informed by Stewart, Bose or Shirk. (Fabrizio Dep. at 72.)

Plaintiff disputes that there was no position open into which she could be demoted. As noted above, Bose indicated that the personnel records showed that Hackett became a Lead Perfusionist due to the reduction in force of Plaintiff's position. (Bose Dep. at 59-60; ECF No. 41 Ex 11; ECF No. 42 Ex. 17 – Answer to Interrog. No. 3.) Hackett did not suffer a break in her employment when her title changed and that Hackett's position changed to a Lead Perfusionist, which required her to change her part-time status to that of full-time. (ECF No. 41 Ex. 11; Hackett Dep. at 59-62.) There is no record evidence Hackett supervised anyone prior to Plaintiff's termination. At the time of Plaintiff's termination, however, Stewart asked Hackett to assume her responsibilities. (Hackett Dep. at 11.) Plaintiff maintains that the management position at issue is the "Lead Perfusionist" position that became available after her termination and which became Hackett's position. (Fabrizio Dep. at 147-48.)

The salary that was earmarked for Plaintiff's Director of Perfusion Services position was used to create two staff-level, non-management positions: a staff perfusionist position and a medical laboratory specialist. (Stewart Dep. at 97.)

Plaintiff's Application and Interview for a Staff Perfusionist Position

After the elimination of Plaintiff's position, a staff perfusionist position was made available. (Fabrizio Dep. at 114-15.) Plaintiff applied for the staff perfusionist position through the normal channels that would be available to any applicant. (Fabrizio Dep. at 116.) On

October 30, 2007, Plaintiff received a telephone call in which she was offered an interview set for October 31, 2007. (Fabrizio Dep. at 117.)

Defendants state that, on October 31, 2007, Plaintiff arrived late for the interview. (Stewart Dep. at 107, 153.) Plaintiff denies that she arrived late for the interview (Fabrizio Dep. at 121), points out that neither Knauf nor Merritt recall her being late for the interview (Knauf Dep. at 28; Merritt Dep. at 28), and notes that Stewart himself testified that she may have been waiting in the hall prior to her interview. (Stewart Dep. at 108.) Stewart, Knauf, Merritt and Hackett were all present to conduct the interview. (Fabrizio Dep. at 120; Stewart Dep. at 104-05.)

Defendants state that Hackett described Plaintiff's demeanor as tense and nervous (Hackett Dep. at 35), that Merritt described it as "standoffish" and antagonistic (Merritt Dep. at 28-29), and that Knauf described it as cold (Knauf Dep. at 28). Plaintiff responds that Knauf testified that, although Plaintiff's demeanor was "cold" during the interview, Knauf did not take this demeanor as a negative factor in the interview. (Knauf Dep. at 28.) Knauf explained that it was "an awkward interview…because of recent events [her termination]." (Knauf Dep. at 29.) Knauf further explained that Plaintiff "was interviewing for a staff perfusion position, and she had been a lot more than that prior to that." (Knauf Dep. at 29.) As such, Knauf was not surprised that Plaintiff's demeanor was different than her prior interactions where she was always warm. (Knauf Dep. at 28, 29.) Merritt also testified that Plaintiff did not act disrespectfully in the interview. (Merritt Dep. at 29.) Stewart also admitted that Plaintiff conducted herself in a professional manner during the interview. (Stewart Dep. at 159-60.) Hackett testified that she herself was also tense and nervous during the interview. (Hackett Dep. at 32, 35.)

Stewart states that Plaintiff also expressed displeasure with the constitution of the group conducting the interview. (Stewart Dep. at 107.) Plaintiff responds that she was "not upset" by the composition of the interview panel. She "may have expressed surprise by the other three [Hackett, Merritt and Knauf] being there. [She] hadn't seen them for two months. And [she] may have expressed some surprise like wow, hi, you know." She "was not upset by the composition of the committee, not at all." Although she was surprised, it was not in a negative way. (Fabrizio Dep. at 120-21.)

Plaintiff knew, at the time the interview was offered, that the position was a Biotronics position in Stewart's area of responsibility. (Fabrizio Dep. at 118-19.) Plaintiff knew that the interview was not for a management position. (Fabrizio Dep. at 119-20.)

Defendants note that, despite the fact that Plaintiff was aware that the interview was not for a management position, she inquired about such a position during the interview and expressed her disappointment that such a position was not available. (Fabrizio Dep. at 122.) According to Stewart, Plaintiff intimated that she was only interested in a management position. (Stewart Dep. at 109.)

Plaintiff disputes any inference that her inquiry about an available management position or disappointment that such position was not available reflected negatively on her. She states that Knauf testified that Plaintiff was interested in more than a staff position but did not say that she was "only interested" in a management position. (Knauf Dep. at 30.) Knauf further testified that she did not blame her for inquiring about a management position. (Knauf Dep. at 30.) Plaintiff testified that she had been told that there was the possibility of a management position so she "just wanted to inquire face to face with Steve [Stewart] about that." (Fabrizio Dep. at 119.) Despite Stewart's notes questioning whether Plaintiff could step down to a lesser position,

Stewart does not recall anyone actually asking her if that were the case. (Stewart 125-26.)

Stewart told Plaintiff that she would only be paid the mid-range of the salary scale applicable to the job because that level was "commensurate" with her "experience." (Fabrizio 123-24; ECF No. 43 Ex. 24.) She was "insulted" by the salary level because it was less than people with less experience were making. (Fabrizio Dep. at 126.) Defendants note that Plaintiff wanted close to $100,000 per annum and the salary mentioned was only $75,000 per annum. (Fabrizio Dep. at 123-24.)

Plaintiff observes that she was expecting a salary "commensurate with thirty-some years of experience" which would have been closer to $100,000, the amount that Hackett earned at the time. (Fabrizio Dep. at 123-24.) She notes that Bose could not think of a reason why Plaintiff would not be told that she would earn the high range of salary if she was hired to fill the open staff perfusionist position. (Bose Dep. at 44-45.)

Defendants state that, at the conclusion of the interview, Plaintiff told Stewart that she would let him know if she was interested in the position. (Fabrizio Dep. at 126; Stewart Dep. at 112; Knauf Dep. at 32; Merritt Dep. at 49.) Defendants state that, despite telling Stewart that she would let him know if she was interested, Plaintiff never got back to Stewart to express any interest. (Fabrizio Dep. at 158 & Ex. 17; Merritt Dep. at 49.)

Plaintiff disputes that the alleged "offer" to her was sincere. She also states that Stewart did not give her any deadline by which to respond. (Stewart Dep. at 134-35.)

According to Stewart's notes, after the interview was concluded, Merritt stated that she believed that the interview had gone poorly and thought that Plaintiff did not seem like she was prepared to move into a lesser position such as staff perfusionist and observed that Plaintiff acted as if she was "still in charge." (Stewart Dep. at 40-45 & Ex. 6.) Merritt thought that Plaintiff

acted as if Plaintiff was the person conducting the interview. At her deposition, Merritt admitted that it was simply her subjective belief that Plaintiff would not be happy in the staff perfusionist position. (Merritt Dep. at 43.) Moreover, Merritt admitted that Plaintiff never said that she would be unhappy in the position. (Merritt Dep. at 44.)

According to Stewart's notes, Knauf indicated that Plaintiff had a lot to offer and felt that they should try to find a position that would allow her to use her experience. Knauf and Hackett felt that Plaintiff's demeanor was a result of her discomfort in the situation and were not put off by it. They were in favor of offering her the position, but Merritt and Stewart were not. (Stewart Dep. 123-24, 155 & Ex. 6.)

Defendants state that, despite his reservations, Stewart originally decided to offer Plaintiff the staff perfusionist position with a total compensation package of approximately $85,000. (Fabrizio Dep. Ex. 11.) Plaintiff responds that, according to Stewart's notes relating to the interview, he voted against offering her the staff position. (ECF No. 41 Ex. 12.) Moreover, the record evidence is clear that Stewart never actually offered the position to Plaintiff and ultimately decided against it. (ECF No. 41 Exs. 14, 15.) She also disputes that Stewart or anyone communicated to her that the compensation of the job was $85,000. Rather, she testified that she was told in the interview that the job would pay $75,000. (Fabrizio Dep. at 124.)

Immediately after the interview, Stewart emailed Ron Quaresima, an HR Specialist, and wrote as follows:

> We conducted our interview of Charlene today, and the majority feels that we should offer her the position. We are prepared to offer her a salary of $78,000. She will be required to take call, which would be approximately $7,000 additional per year. We would like her response by 3pm on Friday – is this something we can do? The feeling is that if she doesn't accept the position, we need to start interviewing other candidates immediately. Please let me know.

(ECF No. 41 Ex. 13.) However, Stewart admitted that nobody informed Plaintiff about the

deadline. (Stewart 133, 134-135.)

On November 2, 2007, Stewart sent another email to Quaresima:

After reviewing my notes and discussing with the group, I'm not convinced that Charlene is willing or capable of accepting a staff position. She made it clear that she is interested in a management position. She was often confrontational during the interview, almost to the point where I felt she was interviewing us. The more I think about it, the more reservations I have. Since it is such a political issue, I need to talk to a couple of people before making a decision….

(ECF No. 41 Ex. 13.)

Four days later, on November 6, 2007, Stewart wrote another email to Quaresima, indicating as follows:

I'm extremely reluctant to offer her the position based on her attitude at the interview and, actually, her lack of experience in the clinical setting. (last year she did only 18 open-hearts). Tomorrow we are interviewing Bill Gill – I will give him the waiver to sign. Should I still do that for Charlene even though I'm not interested?

(ECF No. 41 Ex. 14.)

Several weeks later, on November 21, 2007, Stewart emailed Quaresima and stated as follows:

I am not going to offer the position to Charlene Fabrizio because:

●Her attitude throughout the interview, where she challenged the validity of the group, she clearly stated that she was interested in a management position, challenged the reorganization of the department, and stated disappointment in the salary range (she requested a salary well beyond the upper range for a staff perfusionist)
●Her refusal to answer a key question relative to how active clinically she had been. When asked how many open-hearts she did last year, her response was "I maintained my certification." I said that that is not what I asked, she responded again that she maintained her certification.
●Her lack of clinical experience. I had Jane Hackett pull her caseload from last year and she had only done 18 open-hearts. In my opinion, that is far less than even a new graduate would have done and is not acceptable for a full-time staff perfusionist.
●Her closing remark, when I asked if, after all she's heard about this position, she would still be interested in the position, her reply was, "I'll have to let you know."

Since I have not heard anything, I can only assume that she is not interested.

(Stewart Dep. at 161, ECF No. 41 Ex. 15.)

On December 17, 2007, Defendants sent Plaintiff a letter informing her that she was not hired for the staff perfusionist position because "there were several well qualified applicants for this position. At this time we are considering other applicants whose qualifications more closely meet the position requirements and the needs of the department." (ECF No. 43 Ex. 22.)[16]

Defendants contend that Stewart ultimately decided not to offer the staff perfusionist position to Plaintiff because she interviewed poorly for the position and did not express any interest. (Fabrizio Dep. at 140-41 & Ex. 13; McEwen Dep. at 54-55; Hackett Dep. at 62.) Plaintiff disputes the reason for Stewart's decision and alleges that the record evidence shows that Stewart terminated and failed to rehire her because of her age. Bose was not told a reason why Plaintiff was not hired for the open staff perfusionist position. (Bose Dep. at 41, 45.)

According to UPMC's Recruitment Log, three other persons were also interviewed for the open staff perfusionist position. The three other interviewees were William Gill, Dawn Morelli and Tracey Mineard. (Fabrizio Dep. Ex. 13.) Morelli was eventually hired for the open staff perfusionist position. (Fabrizio Dep. at 142 & Ex. 13.) Morelli was significantly younger than Plaintiff. Stewart could not say whether any of her work experience was as a "certified" perfusionist. (Stewart Dep. at 138, 141; ECF No. 42 Ex. 18.)

Defendants state that Mineard, whose date of birth is October 5, 1981 and was 27 years old at the time the position was filled, was rejected for the position because, like Plaintiff, she

---

[16] Defendants contend that Plaintiff admitted that she considered the fact that she did not call Stewart back to be a withdrawal of her application (Fabrizio Dep. at 159) and that she indicated, in a December 7, 2007 email to Dr. Virji that "[i]t was an insulting experience for me and a I chose not to further the process." (ECF No. 47 Tab A at MCF 285.) However, the evidence is in dispute as to whether the offer still existed as of that date.

interviewed poorly.  (Fabrizio Dep. Exs. 13-14; Merritt Dep. at 50; Hackett Dep. at 63.)

<u>Other Facts Relevant to Plaintiff's Age Discrimination Claims</u>

Between August 1, 2006 and August 31, 2008, UPMC hired 19 persons into perfusion-related positions.  (Stewart Dep. Ex. 13.)  Of those 19 individuals, 10 of them were over 40 years of age at time of hire.  Five of the hired individuals were over 45 years of age, and two were over 50 years of age, including one who was approximately 60 years old.

Plaintiff admits that Defendants correctly cite the record.  However, she notes that the document upon which Defendants rely shows that the majority of the 19 individuals were not under Stewart's supervision. For example, 3 were assigned to "Excela Health Sys PRFUSION," 2 were assigned to "Hawaii Perfusion," 3 were assigned to "Western Reserve-Perfusion," 1 was assigned to "Massillion Perfusion," 2 were assigned to "Trumball-Perfusion," 1 was assigned to "Dubois Perfusion." Moreover, of the 19 individuals Defendants claim to have "hired" between August 1, 2006 and August 31, 2008, 13 were from programs that rolled into Biotronics. In other words, these individuals continued their employment when Biotronics took over perfusion services at their respective locations. (Fabrizio Aff. ¶¶ 12-14.)  Only 2 of the older individuals listed on the document were actually hired by Defendants during this time.  Plaintiff states that she herself rehired one of them, Michael Paul Anselmi, in 2006.  The other, Wendy James, was hired as a casual, not a full-time, employee. (Fabrizio Aff. ¶¶ 15-17.)

<u>Procedural History</u>

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and a complaint with the Pennsylvania Human Relations Commission (PHRC) on February 25, 2008.  The EEOC issued a Notification of Dismissal on June 30, 2010 and Plaintiff waited a year until after filing her PHRC complaint to file suit.  (Compl. ¶ 2.)

Plaintiff filed this action on September 3, 2010. She alleges that Defendants discriminated against her on the basis of her age when they eliminated her position as Director of Perfusion Services for Presbyterian University Hospital on August 31, 2007; when they failed to consider her for an open management position following the elimination of her position; and when they failed to hire her for a staff perfusionist position in October and November 2007. On January 17, 2012, Defendants filed a motion for summary judgment.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

ADEA Claims

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40. 29 U.S.C. §§ 623(a), 631(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc). This model also applies to actions brought pursuant to the PHRA. See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination in a termination case, a plaintiff must establish that she was at least 40 years of age, that she was qualified for the position, that she suffered an adverse employment decision and that she was replaced by a sufficiently younger person to create an inference of age discrimination. Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

With respect to the ADEA, the Supreme Court has held that shifting the burden of persuasion is improper because the plain language of the statute requires the plaintiff to prove that the defendant took the action "because of the plaintiff's age." Gross v. FBL Financial Servs., 129 S.Ct. 2343 (2009). Nevertheless, the Court of Appeals has held that Gross "does not forbid our adherence to precedent applying McDonnell Douglas to age discrimination cases" because McDonnell Douglas does not require shifting the burden of persuasion, but only the burden of production. Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009). Nevertheless, and unlike a case brought under Title VII, "in order to demonstrate pretext under Fuentes, it is incumbent upon the plaintiff to demonstrate that age was a determinative or 'the "but-for" cause of an employer's adverse decision;' it is not sufficient to simply show that age was 'a motivating factor.'" Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 268 (W.D. Pa. 2010) (McVerry, J.) (quoting Gross, 129 S.Ct. at 2349).

Defendants argue that: 1) Plaintiff cannot state a prima facie case of age discrimination with respect to the elimination of her position because she cannot point to a "sufficiently younger," "similarly situated" employee who was retained; 2) she cannot state a prima facie case

with respect to being denied a management position because there was no such position available; 3) she cannot state a prima facie case with respect to Defendants' alleged refusal to hire for the staff perfusionist position because she never let Stewart know that she was interested in pursuing it and thus she voluntarily withdrew her application and, in any event, all of the interviewers noted that her interview performance was not good; 4) even if she could establish a prima facie case, they have proffered legitimate, non-discriminatory reasons for their actions (her position was eliminated because it was redundant of Stewart's, there was no management position available and she was not hired for the staff perfusionist position because she interviewed poorly and expressed no interest in the position); and 5) she has failed to present evidence from which the trier of fact could conclude that these reasons were a pretext for unlawful age discrimination.

Plaintiff responds that: 1) this was not a reduction in force situation and therefore she can meet her prima facie case by demonstrating that her remaining job responsibilities were transferred to a sufficiently younger individual, and Defendants assigned them to Hackett; 2) Defendants promoted Hackett, a sufficiently younger employee, to the newly created Lead Perfusionist position instead of assigning it to her; 3) when Plaintiff applied for the staff perfusionist position, Stewart claims that he was prepared to offer it to her if she expressed an interest in it within two days but no one informed her of this deadline, Stewart later announced that he was not offering her the position and instead Defendants hired Morelli, a significantly younger employee; 4) and 5) the record is replete with evidence from which a fact-finder could reasonably determine that Defendants' stated reasons are a pretext for unlawful age discrimination, including inconsistencies in the proffered reason for terminating her, the fact that Stewart never disciplined her for alleged acts of insubordination, the fact that Stewart admitted

that he and Plaintiff had the same "title" but not that their positions were redundant, and ageist comments made by Stewart directly to her.

Plaintiff's Prima Facie Case

Defendants argue that Plaintiff fails to state a prima facie case of age discrimination with respect to her termination because she has not demonstrated that they retained a "sufficiently younger," "similarly situated" employee. Plaintiff responds that this analysis applies to a reduction in force case, whereas this case was a single termination.

The nature of a prima facie case depends upon the circumstances of the case. Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994). When an employee holds a unique position, the court must adjust the test as follows:

> If a plaintiff is in a unique position which is eliminated, that plaintiff must still have some way of making out a prima facie case; otherwise, the ADEA could not reach an employer who eliminates a unique position because of the age of the employee holding that position. Mindful of the flexibility of the prima facie case elements, this Court concludes that an employee who occupies a unique position that is eliminated may meet the fourth element of a prima facie case by demonstrating that the remaining responsibilities of that position were transferred to persons significantly younger that the employee. See Torre, 42 F.3d at 830–31 (reformulating the fourth element of the prima facie case in light of the circumstances of that case); Duvall v. Polymer Corp., Civ. A. No. 93–3801, 1995 WL 581910, at *6 (E.D. Pa. Oct. 2, 1995) (modifying prima facie case so that it could be satisfied if a plaintiff can show that her younger subordinates were retained and received some of her former duties).

Sosky v. International Mill Serv., Inc., 1996 WL 32139, at *6 (E.D. Pa. Jan. 25, 1996) (footnote omitted), aff'd mem., 103 F.3d 114 (3d Cir. 1996).

Plaintiff contends that Hackett is the younger employee to whom her duties were transferred upon her termination. Defendants respond that Hackett, who was 53 years old, was not "sufficiently younger" than Plaintiff, who was 60. However, the Court of Appeals has not adopted a bright-line rule as to how much younger the other employee has to be to satisfy an age

discrimination plaintiff's prima facie case.[17]  See Steward v. Sears Roebuck & Co., 231 Fed.

Appx. 201, 209 (3d Cir. 2007) (refusing to adopt a rule that a 6.75 year difference is

insufficient); Ramanna v. County of Beaver, 2008 WL 4204713, at *9 (W.D. Pa. Sep. 11, 2008)

(Conti, J.) (plaintiff who was between 3 and 8 years older than similarly situated employees who

were retained established a prima facie case of age discrimination).  In addition, the Supreme

Court has held that "[t]he fact that one person in the protected class has lost out to another person

in the protected class is thus irrelevant, so long as he has lost out *because of his age*."  O'Connor

v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996).  Because Plaintiff was seven

years older than Hackett, who took over her job responsibilities, Hackett qualifies as the

"sufficiently younger," "similarly situated" employee.

Defendants also argue that Plaintiff has failed to produce evidence that they were aware

of the relative age differential between her and Hackett.  They cite Geraci v. Moody-Tottrup

Int'l, Inc., 82 F.3d 578 (3d Cir. 1996), a pregnancy discrimination case holding that there was no

evidence that the employer knew the employee was pregnant, and Woodman v. WWOR-TV,

Inc., 411 F.3d 69 (2d Cir. 2005), an age discrimination case in which the adverse employment

decision was made by officials from another company that merged with the plaintiff's company

and who had never met the plaintiff or reviewed her personnel file, so they did not know her age.

Defendants' argument is unavailing.  First, the Court of Appeals for the Third Circuit has

never applied the "lack of knowledge" argument discussed by the Second Circuit in Woodman to

an age discrimination case.  Indeed, in Geraci, the court noted "[t]he traditional McDonnell

---

[17] Defendants cite Narin v. Lower Merion School District, 206 F.3d 323 (3d Cir. 2000), in which
the court appears to suggest that less than seven years is an insufficient amount. Id. at 333 n. 9.
However, it is unlikely that the court would make such a holding--more severe than that of
several other circuits--in a footnote after discussing the plaintiff's evidence of pretext and
without further explanation.  As observed in the text, in cases since Narin, the court has stated
that it has not adopted a bright-line rule.

Douglas-Burdine presumption quite properly makes no reference to the employer's knowledge of membership in a protected class because, in the vast majority of discrimination cases, the plaintiff's membership is either patent (race or gender), or is documented on the employee's personnel record (age)." 82 F.3d at 581. See Adkins v. Shoe Show of Rocky Mount, Inc., 2005 WL 662664, at *4 (D. Del. Mar. 16, 2005) (rejecting argument that managers who fired Adkins did not know her age because it is not a factor enunciated in McDonnell Douglas and because it would have been documented in her personnel record, citing Geraci).

Second, Woodman itself recognized that "in the majority of age discrimination cases, a defendant employer's knowledge of a plaintiff's age will be undisputed because employers routinely maintain employee age information in their personnel files or are generally aware of employees' relative ages from personal on-the-job contact." 411 F.3d at 80. But Woodman's case was "atypical because the decision to terminate her was not made by her long-time employer but by officials of an acquiring company who had apparently never met her or reviewed her personnel file." Id. Thus, even Woodman does not stand for the proposition that every employer can avoid liability for age discrimination by simply claiming that it did not know the plaintiff's age, no matter how long she worked for the company and despite documentation in the personnel records. Moreover, the Woodman court acknowledged that "a defendant's knowledge as to an ADEA plaintiff's relative age need not be demonstrated, at any stage of the proceedings, by direct proof," id. at 83, and noted that "a party's knowledge of a disputed fact may also be proved through evidence that he consciously avoided knowledge of what would otherwise have been obvious [to] him." Id. at 84 n.14. Nevertheless, the court found that Woodman's evidence did not establish defendants' knowledge of her relative age because her 16 years of service would not necessarily have put them on notice that she was likely in the

protected class and was sufficiently close to the 12 years of service attained by her replacement that they could easily have been the same age, there was no evidence that the acquiring company ever requested employee age information and the plaintiff's expert could not testify as to the credibility of the defendants' executives based on standard practices in the industry because witness credibility is a jury issue.

This case, unlike Woodman, is the typical case in which a supervisor would be expected to know a plaintiff's approximate age and the age of her replacement from their personnel files and from on-the-job contact. The personnel file would have revealed Plaintiff's age and the fact that she had been hired as a staff perfusionist at Children's Hospital (which would later become part of UPMC when the department was moved to Presbyterian University Hospital) in 1982, 25 years prior to her termination. (Fabrizio Dep. at 6-7.) See Bose Dep. at 38 (noting that Plaintiff had worked there for about 25 years). Personnel records would also have revealed Hackett's age. Moreover, Stewart, who was the primary individual responsible for terminating Plaintiff, was not an outsider like the decision makers in Woodman, but in fact had met her over 30 years prior to the time of her termination and she was one of his instructors when he was a student in 1976. (Fabrizio Dep. at 13-14.) Thus, it is a reasonable inference that Stewart knew her relative age.[18] To the extent that he disclaims knowledge of her relative age (Stewart Dep. at 142), this position suggests that he is "consciously avoiding knowledge of what would otherwise have been obvious to him." For all of these reasons, Plaintiff need not proffer any additional evidence that Defendants were aware of her age and Hackett's at the time of her termination.

With respect to the claim relating to the open management position, the evidence is

---

[18] Defendants go so far as to comment that "[t]he fact that Mr. Stewart knew Plaintiff is not evidence that he knew her age." (ECF No. 45 at 5.) This is ludicrous. Unless Plaintiff was under 10 years old at the time she taught Stewart in 1977, it is not only a reasonable inference but a certainty that he knew she was over 40 years old in 2007.

seriously disputed as to whether such a position was available. Defendants contend that it was not, but this conclusion depends upon Hackett having been the Lead Perfusionist at Presbyterian University Hospital since 2001. As explained above, that fact is vigorously contested and the record, viewed in the light most favorable to Plaintiff as the non-moving party, certainly allows for the inference that Hackett was the "team leader" of the staff perfusionists until Plaintiff's termination and was then promoted into the position of Lead Perfusionist, where she took over most, if not all, of Plaintiff's responsibilities.

Finally, with respect to the claim relating to the failure to hire Plaintiff for the staff perfusionist position, Defendants argue that Plaintiff never let Stewart know that she was interested in pursuing it and thus she voluntarily withdrew her application and, in any event, all of the interviewers noted that her interview performance was not good. However, this conclusion also depends upon drawing inferences against Plaintiff, which is improper. The record, which is in considerable dispute, allows for the inferences that: 1) Stewart set a deadline for Plaintiff to let him know she was interested in the position but never told her about this deadline; 2) "the majority" of interviewers were in favor of hiring her but Stewart was against the idea and he shortly notified Quaresima that he was "not going to offer the position" to her (but did not inform her about this decision); and 3) Defendants' position that she withdrew her application in effect by not getting back to Stewart is a post-hoc rationale.

<u>Defendants' Proffered Reasons and Plaintiff's Evidence of Pretext</u>

The burden of production shifts to Defendants to articulate legitimate, non-discriminatory reasons for Plaintiff's termination, failure to be moved to a management position and failure to be hired for a staff perfusionist position. Defendants contend that Plaintiff's position was eliminated because it was redundant of Stewart's position, that an open management position did

not exist and that she was not hired for the staff perfusionist position because she interviewed poorly and did not possess sufficient credentials for the position. Defendants have thus satisfied their relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that these proffered reasons are a pretext for unlawful age discrimination and proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). She also proceeds along "Fuentes prong two" by arguing that Defendants' own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Keller, 130 F.3d at 1111.

Fuentes Prong One

Proceeding along Fuentes prong one, Plaintiff argues that there are serious inconsistencies and contradictions in Defendants' proffered reasons for their actions, such that a factfinder could conclude that they are unworthy of belief. "Substantial changes over time in [an] employer's proffered reason for its employment decision support a finding of pretext." Christian Legal Soc. Chapter Univ. of Calif., Hastings College of Law v. Martinez, 130 S.Ct. 2971, 3017 (2010) (citations omitted). See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 284 (3d Cir. 2001).

Plaintiff argues that Stewart has, at various times, testified that the reason for her termination was: 1) "her insubordinate nature"; 2) her "lack of accountability" and the redundancy of her title and his own; and 3) the redundancy in her position and his. She also observes that he admitted that he never counseled her or warned or disciplined her about her

alleged acts of insubordination and he also admitted that the two of them had different job responsibilities.[19]

Plaintiff notes that Stewart testified later in his deposition, when asked if there is a real distinction between saying she was terminated in part because of her contentious relationship with him and the redundancy of her position and answered, "my position is that the position that she held was redundant and that it was eliminated." (Stewart Dep. at 152-53.) Thus, he appears to focus on the redundancy rationale. However, the record contains genuine issues of material fact as to whether Stewart's position was redundant with Plaintiff's and this reason fails to address the question of why Plaintiff could not have been demoted to the position of Lead Perfusionist, a position that would not have been redundant of Stewart's.

Defendants contend that Stewart's reasons are not inconsistent with one another and that, in fact, Plaintiff used the fact that she and Stewart had the same position to justify her insubordination. They further contend that Stewart verbally informed Plaintiff about his concerns with her attitude.

The Court of Appeals has stated that an "employee's assertions of his own good performance were insufficient to prevent summary judgment where the employer produced performance reviews and other documentary evidence of misconduct and insubordination that demonstrated poor performance." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995). However, the court has also held that:

> Where, as here, Sempier asserts not only that he performed well but that he never received any unfavorable criticism that his performance was poor or inadequate, the jury could conclude that J & H's failure to fault Sempier's performance for the twenty years prior to the negotiations leading to his discharge makes suspect its post hoc assertions of poor performance. This is especially true

---

[19]  In their Concise Statement, Defendants assert that the reason for the elimination of Plaintiff's position is that is "was redundant of Mr. Stewart's." (ECF No. 30 ¶ 38.)

> when J & H has failed to produce any other evidence of poor performance or
> make specific allegations of Sempier's deficiencies.

Id. Thus, although Plaintiff could not assert her own good performance in response to "employer produced performance reviews and other documentary evidence of misconduct and insubordination," if the employer never documented these alleged deficiencies and only raises them now, the trier of fact must be allowed to hear this evidence and consider whether it is a post-hoc rationalization in response to Plaintiff's claim of age discrimination.

At the time of her termination, Plaintiff was told that her position was being eliminated because of a "reorganization." (Fabrizio Dep. at 6, 47.) She was not told that her position was redundant of Stewart's, much less that she was being terminated for acts of insubordination. See also Merritt Dep. at 25-26 (Stewart told her that Plaintiff's position was eliminated because there was a "duplication of positions" and directed her to gather the staff at Shadyside and inform them about the "reorganization"); Bose Dep. at 40 (not aware of any progressive discipline or bad performance issues that Plaintiff had while employed); Terwilliger Dep. at 16 (was told Plaintiff's position was eliminated because of a reorganization); Stewart Dep. at 79 (Stewart told Wei and McCurry that Plaintiff's position was "redundant").

Plaintiff also notes that, six months prior to his deposition in this case, Stewart testified in another case that there was one reason he terminated Plaintiff: "her insubordinate nature." (ECF No. 40 Ex. 8.) Defendants argue that Stewart's testimony in this regard is accurate and presents no contradiction because he explicitly testified that the redundancy in Plaintiff's position allowed her to be "contentious." (Stewart Dep. at 152.) However, that issue is vigorously disputed and the Court cannot resolve it in the context of this motion for summary judgment.

Defendants cite Hoechstetter v. City of Pittsburgh, 79 Fed. Appx. 537 (3d Cir. 2003), for the proposition that an employer's shift in reasons must be dramatic to constitute evidence of

pretext. In that case, two white males brought suit after they were rejected for admission into the Pittsburgh police force and they contended that Chief McNeilly's deposition testimony was inconsistent with the City's answer to the plaintiffs' interrogatories inquiring as to the reasons. The court held that there was no inconsistency: numerous reasons were cited but the City maintained that one was not hired primarily based on his marijuana use and the other primarily based on his poor credit history and financial irresponsibility.

In this case, by contrast, Defendants have shifted course. At the time of Plaintiff's termination, Stewart said that the reason was a reorganization and told others that Plaintiff's position was redundant with his. Subsequently, he has stated that the reason was her acts of insubordination, even though there is no written record of such acts, Stewart cannot recall ever disciplining her for them and no one other than Stewart is aware of this purported reason.

Moreover, even focusing on the "redundancy" issue, as noted, the record contains genuine disputes as to whether Plaintiff and Stewart had the same title, the same position and the same responsibilities. In addition, Stewart admitted that, a year before Plaintiff was terminated, he told her that she was going to keep her title of Director and her compensation related to that title. (Stewart Dep. at 91.)

With respect to the claim involving the failure to hire, Plaintiff argues that Stewart contradicted himself regarding whether he wanted to offer her the staff perfusionist position. Stewart initially testified that the number of procedures Plaintiff performed did not cause him to have "any reservations" about hiring her. (Stewart Dep. at 119.) Stewart acknowledged that Plaintiff performed a sufficient number of procedures for her to maintain her perfusion certification. (Stewart Dep. at 138.)

A few minutes later in his deposition, Stewart was confronted with an email he wrote to

Quaresima two days after Plaintiff's interview for the open staff perfusionist position that stated that he was "extremely reluctant to offer her the position" in part, based on "her lack of experience in the clinical setting." (Stewart Dep. at 135; ECF No. 41 Ex. 13.) Stewart admitted that in the email, he used the number of procedures Plaintiff had done as a negative factor. (Stewart Dep. at 135.) Stewart admitted that there is no part of the staff perfusionist job description that Plaintiff could not do. (Stewart Dep. at 146, ECF No. 42 Ex. 16.)

Defendants contend that these facts are "immaterial" to their motion for summary judgment because, in his November 2, 2007 email to Quaresima, Stewart indicated "the majority feels that we should offer her the position" and that they were "prepared to offer her a salary of $78,000," plus $7,000 more per year for taking call. Thus, they contend that "it is undisputed that Mr. Stewart decided, at one point, to extend an offer to Plaintiff." (ECF No. 46 ¶ 68.) This argument is unavailing because: 1) Plaintiff was never made aware of this alleged "offer"; 2) Stewart subsequently "changed his mind"; and 3) and the only notice Plaintiff received was that she had not been hired for the position. Defendants' argument might make sense if Plaintiff had been hired for the position and then subsequently terminated based on the "legitimate, non-discriminatory" reasons identified by Stewart in his November 21, 2007 email to Quaresima, but that is not what occurred here.

Defendants argue that Stewart "changed his mind afterwards not because of Plaintiff's age, but because her interview performance was deplorable and she expressed no interest in the position at all." (ECF No. 45 at 12.) However, they cite no authority in support of the argument that an employer's "initial" decision to hire an employee, which is followed by a "subsequent" decision not to do so, based on factors that have not changed and in which none of these decisions are communicated to the applicant, can be used to demonstrate a lack of discriminatory

intent.

In their Concise Statement, Defendants indicate that Plaintiff was not hired because she "interviewed poorly for the position and did not express any interest." (ECF No. 30 ¶ 67.) They aver that Tracey Mineard, a younger individual, also interviewed poorly and was similarly not hired for that reason. (Id. ¶ 71.) However, they have also argued that Plaintiff in effect withdrew her application and that she lacked clinical experience, facts that are seriously disputed. As in the case of the decision to terminate her employment, Defendants have proffered various inconsistent reasons for the adverse employment action and the trier of fact will have to evaluate the evidence and decide whether Plaintiff's failure to be hired was a result of age discrimination.

To summarize, there are genuine issues of material fact with respect to at least the following issues in this case: 1) whether Stewart was the Director of Perfusion Services or the Senior Director of Perfusion Services; 2) whether Jane Hackett was a Lead Perfusionist or merely the "team leader' of the staff perfusionists prior to Plaintiff's termination and thus whether an open management position was available when Plaintiff was terminated; 3) whether Plaintiff was late for her interview for the staff perfusionist position; 4) whether Plaintiff was "only" interested in a management position; 5) whether Plaintiff possessed the clinical ability to do this job; 6) how the situation was left at the end of the interview, and specifically whether Plaintiff was supposed to let Stewart know if she wanted the position and in what time frame; and 7) whether Stewart was willing to offer her the position following the interview and if so, when and under what circumstances did he "change his mind."

Plaintiff has pointed to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that

the employer did not act for [the asserted] non discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765.

Therefore, based on Plaintiff's <u>Fuentes</u> prong one evidence, Defendants' motion for summary

judgment should be denied. However, she also has <u>Fuentes</u> prong two evidence.

Fuentes Prong Two

With respect to <u>Fuentes</u> prong two, the Court of Appeals has stated that:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was a … determinative factor in the employment decision. <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1111 (3d Cir. 1997). For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class. <u>Fuentes</u>, 32 F.3d at 765.

<u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644-45 (3d Cir. 1998).

Plaintiff points to certain comments allegedly made by Stewart, i.e., that "at our age, we

begin to slow down," and "as we get older it gets harder." These comments can be considered as

part of the pretext analysis.

Six months prior to her termination, on February 6, 2007, Plaintiff attended a meeting in

Churchill with several of the Lead Perfusionists, Jack McEwen and Stewart. (Fabrizio Dep. at

45; McEwen Dep. at 9.) Stewart asked to speak privately with Plaintiff after the conclusion of

the meeting. (Fabrizio Dep. at 45.) During their private meeting, Stewart apologized for being

harsh towards Plaintiff on an unrelated matter but said that he was insulted by the fact that

Plaintiff said he had not treated her well. (Fabrizio Dep. at 45-46.) He also said to Plaintiff that

"at our age, we might miss a step or two, and as we get older, we might not perform as well as

previously." (Fabrizio Dep. at 46.) In response, Plaintiff asked Stewart if "this is ultimately

about [her] age." (Fabrizio Dep. at 46.) Stewart did not deny the accusation and instead told

Plaintiff that she had a deadline of two days to advise Stewart whether she would remain employed or leave and the meeting concluded and he never spoke with her again about resigning. (Fabrizio Dep. at 46.)  Defendants respond that Stewart "does not recall" making this comment. (Stewart Dep. at 71-72.)

Plaintiff states that, after their meeting, Stewart began to remove some of her job responsibilities.  (Fabrizio Dep. at 46.)  Defendants note that Plaintiff does not provide any facts to indicate that the elimination of her responsibilities was the result of the alleged conversation that she had with Stewart.  However, she can testify as to the sequence of events and the trier of fact will have to determine what occurred.

Plaintiff further contends that Stewart made similar ageist comments during her interview for the staff perfusionist position. She testified that he questioned whether she was physically capable of performing the staff perfusionist position and "said as we get older it gets harder, and expanded on another person within Biotronics who had said he was older, and it was harder, and also he thought that I could not perform the duties, physically, saying that he didn't think I could work all night long."  (Fabrizio Dep. at 77, 100-101, 130-32.)[20]  Stewart did not deny that he ever made such ageist comments, but instead testified that he does "not recall" whether he made them.  (Stewart Dep. at 71, 74.)  As noted above, Plaintiff also made reference to Stewart's implication that she should leave because of her age in her August 21, 2007 email to Bingham, ten days before her employment was terminated.  (Fabrizio Dep. Ex. 4.)

Defendants repeatedly assert that: "Not a single witness who testified in this case other

---

[20] Defendants contend that Plaintiff's statement that Stewart mentioned another older staff perfusionist (Robert Dyga) who had problems maintaining call is "completely incredible" given Dyga's subsequent success.  (ECF No. 32 at 18 n.10.)  However, Stewart himself testified that he mentioned Dyga  as a former management person who had difficulty adjusting to a staff perfusionist position, which led to his "concern" that Plaintiff could not make the adjustment. (Stewart Dep. at 120.)

than Plaintiff ever recalls Mr. Stewart making any ageist comments relating to Plaintiff." (ECF No. 32 at 15 n.7; ECF No. 46 ¶¶ 80-86.) They appear to be arguing that Plaintiff's testimony should not be believed, an argument that can be presented to the trier of fact, but has no place when the Court is considering a motion for summary judgment.[21]

Plaintiff notes that Paula Merritt stated that Stewart made comments about his own age and getting older. (Merritt Dep. at 17.) Specifically, she testified that, while she never heard of Stewart making any comment relating to Plaintiff's age at any time, Stewart did refer to himself at times and say that "as I'm getting older, it's harder and harder for me to do this every day." (Merritt Dep. at 17.) Merritt testified that Stewart was referring to himself in a joking manner and never made any such comment about any other employee. (Id. at 17-18.) He may have done so five to ten times.

Defendants argue that Merritt's testimony indicates only that Stewart was referring to himself in a joking manner and that his comments cannot be construed as constituting discriminatory intent. However, Stewart's comments are ambiguous and the trier of fact will have to determine whether Plaintiff reasonably concluded that they referred to her if Stewart made them under the circumstances she described.

Defendants argue that "[e]very comment about age, particularly by on who is [him]self in the protected age class, does not evince discriminatory animus." Braithwaite v. Accupac, Inc.,

_____

[21] Defendants also contend that it is "an unanswered question" why Plaintiff did not bring her complaints about Stewart's comments to Michael Payne, a human resources employee of UPMC with whom she had a "good professional relationship." (ECF No. 32 at 15 n.8.) This argument is irrelevant. This is not a hostile work environment case in which an employer can avail itself of the affirmative defense that it had in place an anti-harassment policy and that the plaintiff failed to take advantage of it. Rather, Plaintiff suffered adverse employment actions when her employment with Defendants was terminated and when she was not hired for the staff perfusionist position. If the jury finds in her favor, Defendants will be held vicariously liable for Stewart's comments and actions. Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

2002 WL 31928434, at *4 (E.D. Pa. Dec. 30, 2002), aff'd mem., 90 Fed. Appx. 434 (3d Cir. Jan. 23, 2004).  However, they have taken this quote out of context.  In that case, John Braithwaite had been president of Accupac since 1992 and the head of the company was Eileen Heck.  In 1999, when he was 66 and Heck was 68, she suggested that he consider retiring, pointing out that she and her husband were enjoying their newfound leisure time and that "at your age, you should smell the roses."  The parties agreed that Braithwaite had fallen asleep at business meetings, but Braithwaite attributed this to the boring nature of the presentations being made.  Two months later, Heck's son and Accupac CEO Bruce Heck told Braithwaite that he looked tired and suggested he take some vacation time.  Shortly thereafter, Braithwaite's contract was not renewed because of marked decline in sales and profits, his refusal to comply with a key element of the strategic plan adopted to improve the company's profitability and the perception that he had become increasingly less focused and engaged.  Braithwaite sued for age discrimination.  In response to Braithwaite's argument that the comments by Eileen and Bruce Heck constituted direct evidence of age discrimination, the court stated as follows:

> A comment by Eileen Heck at age 68 to a 66 year old executive employee who was also a personal friend that one reaches an age where it is nice to enjoy leisure time and smell the flowers would not directly reflect a discriminatory animus. The suggestion of retirement to an eligible employee whose performance is unsatisfactory does not give rise to an inference of age discrimination. See Ziegler v. Beverly Enterprises-Minnesota, Inc., 133 F.3d 671, 676 (8th Cir. 1998) ("[w]e do not think that suggesting retirement to an employee who is eligible for retirement, and who is not performing satisfactorily, provides a reasonable basis for inferring age discrimination"). A suggestion by Bruc[e] Heck to an executive employee, even one who had not fallen asleep in meetings, that he seemed tired and should take some vacation time does not directly reflect a discriminatory animus based on age. Plaintiff has not presented direct evidence of age discrimination.

Id. at *5 (footnote omitted).

In this case, Plaintiff is not contending that Stewart's comments constitute direct

42

evidence of age discrimination.  Rather, she is citing them in support of her argument that Defendants' reasons are a pretext for unlawful age discrimination under <u>Fuentes</u> prong two.  In addition, Stewart was not suggesting the idea of retirement to an eligible employee whose performance was unsatisfactory.  Defendants agree that Plaintiff was not terminated for performance reasons and they have not even argued that she was eligible for retirement or that Stewart was suggesting the idea of retirement because he thought it would be in her best interest.

Defendants also cite <u>Connolly v. Pepsi Bottling Group, LLC</u>, 347 Fed. Appx. 757 (3d Cir. Oct. 2, 2009), to support their argument that Stewart's comments were "stray remarks."  In <u>Connolly</u>, the Court of Appeals affirmed this Court's order granting summary judgment for the defendant in an age discrimination case.  Robert Connolly, who was the Key Account Manager for Pepsi Bottling Group (PBG), was terminated in June 2006 because he was involved in a situation in which two versions of a contract were signed and he did not tell PBG about it, which created a serious problem with UPMC, one of PBG's customers.  He pointed to various comments made by two of his supervisors between 2005 and February 2006 that he was "an old man," "a legacy liability," that the "job had passed him by" and that he "did not fit the mold for a trainer."  The court held that these comments "were made months before defendant's decision to terminate plaintiff and outside the context of that decisionmaking process."  <u>Id.</u> at 761.

Defendants argue that the comments Plaintiff claims Stewart made are "stray" remarks that do not constitute evidence of pretext.  The Court of Appeals has held that: "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  <u>Fuentes</u>, 32 F.3d at 767 (citation omitted).

In this case, Plaintiff has argued that the process which culminated in her termination

began some time prior to August 31, 2007 and may be linked to Stewart's comments on February 6, 2007, following which she alleges he began removing her job responsibilities. Thus, it is not clear whether the February 6 remark was made outside of the context of the decisionmaking process that resulted in her termination. Moreover, even if this argument applies to the February 6, 2007 comment, it cannot apply to the comments Plaintiff alleges Stewart made at her interview on October 31, 2007, temporally proximate to the decision not to hire her for the staff perfusionist position.

In addition, in Connolly, the plaintiff did not dispute that he signed two different versions of the PBG/UPMC contract on the same day and did not tell his supervisors about it until after UPMC brought the matter to PBG's attention. Here, by contrast, Plaintiff was not terminated for performance reasons and the record is seriously in dispute regarding Defendants' proffered reasons that her position was redundant with Stewart's and that she engaged in acts of insubordination. Thus, the facts are significantly different than those in Connolly, and Stewart's alleged remarks weigh more heavily against Defendants' proffered reasons.

Finally, Defendants argue that, because Stewart was himself in the same "protected group" this fact weakens the inference that he was biased against Plaintiff because of her age. However, the Supreme Court has held that: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998). Defendants cite a district court case, Allen v. Petsmart, Inc., 512 F. Supp. 2d 288, 294-95 (E.D. Pa. 2007), to support their argument about weakening the inference. The Allen case cites another district court case, which in turn cites another district court case. These cases either predate Oncale or fail to discuss it. This Court does not find these cases to be

persuasive authority, particularly in light of <u>Oncale</u>, that the Court of Appeals would adopt the "weakening the inference" rationale.  <u>See also</u> <u>Waldron v. SL Industries, Inc.</u>, 56 F.3d 491, 496 n.6 (3d Cir. 1995) (Court of Appeals refuses to adopt the "same actor" inference which would allow an employer to argue that, because the same person hired and fired the employee, that person could not have acted with discriminatory intent).

Plaintiff has pointed to evidence which would "allow the factfinder to infer that discrimination was more likely than not a … determinative cause of the adverse employment action."  Thus, pursuant to <u>Fuentes</u> prong two as well as <u>Fuentes</u> prong one, she has demonstrated that Defendants' motion for summary judgment should be denied.

For these reasons, it is recommended that the motion for summary judgment filed on behalf of the Defendants (ECF No. 29) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within the time specified in the Notice of Electronic Filing. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections will waive the right of appeal.


Respectfully submitted,


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge


Dated:  April 23, 2012